## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREGORY BLAKE, ADMINISTRATOR | : | |
| OF THE ESTATE OF ARLENE O. | : | |
| BLAKE, DECEASED, | : | |
|       Plaintiff, | : | CIVIL ACTION |
| | : | |
|       v. | : | NO. 12-3456 |
| | : | |
| | : | |
| MAIN LINE HOSPITALS, INC., d/b/a | : | |
| LANKENAU MEDICAL CENTER and | : | |
| LANKENAU HOSPITAL, et al., | : | |
|       Defendants. | : | |

FILED

APR - 3 2014

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

### MEMORANDUM OPINION

**Tucker, C.J.**                                                      **April 2, 2014**

Presently before this Court is Defendants' Main Line Hospitals, Inc. d/b/a Lankenau

Medical Center and Lankenau Hospital, and Main Line Health, Inc. d/b/a/ Main Line Health

System's motion for partial summary judgment on Plaintiff's EMTALA screening claim (Doc.

43), and Plaintiff's Response in Opposition thereto (Doc. 44).   Upon consideration of the

parties' motions with briefs and exhibits, this Court will deny Defendants' motion.

## I.   BACKGROUND

The tragic facts of this case are as follows.   Around 12:30 am on August 11, 2011,

Arlene Blake ("Blake") awoke with chest pain.   She called 9-1-1, and EMS technicians arrived

at her home around 1:54 am.   The EMS technicians noted in their report narrative that Blake

was diaphoretic, complaining of substernal chest pressure, and had a history of hypertension but

had stopped taking her medication.    At 1:54 am, Blake was given a nitro spray, with no change, and had a normal ECG.    Blood pressures of 230/130 and 216/143 were noted at 2:08 am. Blake was given two more nitro sprays at 2:08 am and 2:12 am, respectively, again with no change.    Blake's blood pressure then subsequently declined to 199/140 at 2:12 am, and 177/141 at 2:13 am.    Blake was transported to the Lankenau Hospital Emergency Department by ambulance, arriving at approximately 2:09 am.

Upon arrival, care was transferred from EMS to the receiving RN without incident. According to the Emergency Nurses Clinical Report, Blake was triaged by RN Matthew Geitl at 2:22 am; at that time, she had a level 2 acuity.    At 2:26 am, Blake was alert and not in acute distress.    Her chest pain was described as being on her left side, and radiating to her back. Geitl drew blood labs, and at approximately 2:26 am an EKG was taken.    At 2:58 am, RN Cynthia Faust ("Faust") noted that Blake appeared uncomfortable and that her chest pain was reproducible.    At 2:59 am, Faust recorded that Blake was ready for evaluation, and that her chart had been flagged.    At 3:45 am, an intravenous line was inserted after Blake had pulled out her previous pre-hospital gauge.    Faust logged that Blake was waiting for evaluation at 4:15 am.

There is some discrepancy as to when Dr. Seema Rathi ("Rathi"), Defendants' emergency room physician, first saw Blake.    The Emergency Nurses Clinical Report first notes the presence of a physician at 5:40 am, when "physician and additional staff" were at Blake's beside.    Def. Mot. for Partial Summ. J., Ex. E, Emergency Nurses Clinical Report at 000028. In her deposition, Rathi states that she initially reviewed the patient's EKG at some point in time, and that Blake was "seen and evaluated by the nursing staff who were to come and interrupt me with other patients if there was any change in her status."    Pl. Resp., Ex. 2, Seema Rathi, M.D.,

2

Dep. at 88:22-89:3.   Rathi also contends in her deposition that between the time the Emergency

Nurses Clinical Report states Blake was waiting to be seen, 4:15 am, and when the code was

called, approximately 5:40 am, she (1) saw and evaluated Blake, (2) ordered medications, and (3)

spoke to a hospitalist about the fact that Blake would most likely need to be admitted to the

hospital.   Id. at 98:16-99:5.   Rathi later concedes that she may have first seen Blake as late as

5:30 am.   Id. at 110:10-16.   In her deposition, Faust notes that, at some point in time, she

notified Rathi that Blake needed something for pain. Pl. Resp., Ex. 3, Cynthia Faust, R.N., Dep.

at 75:1-76:19.   Faust also recalls speaking with Rathi on another occasion, believes that they

may have talked about tests, but admits she does not remember the exact content of the

conversation.   Id. at 83:14-84:6.   More specifically, Faust recalls a third conversation with

Rathi regarding medication orders after Rathi saw Blake.   Id. at 82:20-83:13.   Faust alleges

that right before she gave Blake the ordered medication, she saw Rathi leaving Blake's room,

and recalls Rathi telling her that "she thought it was her gallbladder and we were going to admit

her for a chest pain rule out."   Id. at 58:22-59:7.   She approximates that about ten minutes

passed between Rathi walking out of the room and her giving Blake the ordered aspirin and

nitroglycerin 0.4 mg sublingual around 5:40 am.   Id. at 59:8-16.

Immediately after being given the nitro, Blake stated "I don't feel right," and appeared to

have a seizure.   When no pulse was detected, CPR was initiated, Blake was intubated, and she

was given code medications.   After forty minutes, Blake had received the maximum level of

code medications, but there was no change in her status.   She was pronounced dead at

approximately 6:20 am.   Her autopsy allegedly stated that the cause of death was

hemopericardium from a ruptured aortic dissection.   Blake was 47 years old.

Dr. Rathi completed an Emergency Physician Clinical Report, electronically signing it at 6:52 on August 11, 2011.   The report states that Blake's chief complaint was chest pain, located in the left chest area and radiating to the upper back, and that this pain was reproducible.   She also notes in the report that an EKG had been completed, with a result of "[n]o acute process," and various tests had been ordered, including cmp, troponin, hcg, lipase, and cbc.   Def. Mot. for Partial Summ. J., Ex. E, Emergency Physical Clinical Report at 000019.   Rathi also records that various medications, including aspirin, nitroglycerin sublingual, and lopressor had been ordered. Under the "Clinical Impression" portion of the report, Rathi notes "[a]typical chest pain."   Id.

In her deposition, Rathi states that although the "modality of choice" to diagnose an aortic aneurysm would be a CT scan, and that an aortic aneurysm was in Blake's differential, no CT scan was ordered because Blake had just been administered aspirin and nitroglycerin.   Rathi Dep. at 68:13-24; 134:19-24.   She continues that she would have wanted to wait to see how the nitro affected Blake before ordering a CT scan or other follow up tests, and that, at that time, they were working Blake up for a more common acute myocardial infarction ("MI") heart attack, which can present in the same way.   Id. at 69:3-70:7; 122:15-123:24.   She additionally notes that at the time of the code, approximately 5:40 am, MI had not been ruled out or in, and that she also did not have evidence that an aortic aneurysm was definitively occurring.   Id. at 133:15-134:18.

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A "genuine" issue exists where there is a "sufficient evidentiary basis on which a

4

reasonable jury could return a verdict for the non-moving party."   Byrne v. Chester Cnty. Hosp., CIV.A. 09-889, 2012 WL 4108886, at *2 (E.D. Pa. Sept. 19, 2012) (citing Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)), aff'd sub nom. Byrne v. Cleveland Clinic, 519 F. App'x 739 (3d Cir. 2013).   "A factual dispute is 'material' if it might affect the outcome of the case under governing law."   Id.   All factual doubts should be resolved, and all reasonable inferences drawn, in favor of the nonmoving party.   Torretti v. Main Line Hospitals, Inc., 580 F.3d 168, 172 (3d Cir. 2009) (citing DL Res., Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 216 (3d Cir. 2007)).   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."   Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).   The movant is responsible for "informing the court of the basis for its motion for summary judgment and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact."   Byrne, 2012 WL 4108886 at *2 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

**III.    DISCUSSION**

Defendants move for partial summary judgment on Plaintiff's Emergency Medical Treatment and Active Labor Act (EMTALA) claim for failure to screen.   They argue that the EMTALA screening requirements were met in the instant matter because Blake was "triaged, monitored, assessed, and treated in accordance with the normal and customary practice of the Emergency Department."   Def. Mot. for Partial Summ. J. 4.   In addition, Defendants aver that

5

Plaintiff has failed to proffer any evidence that shows Blake received care that deviated from that given anyone else in the Emergency Department that evening, as required by the statute. Therefore, Defendants posit that this action only sounds in negligence, and any claim under the EMTALA must be dismissed.   In response, Plaintiff contends that Defendants failed to screen Blake for the emergency medical condition Rathi *perceived* her to have, an aortic dissection, as required under the EMTALA.   Plaintiff thus argues that the motion for partial summary judgment should be denied.

The EMTALA was enacted in response to concerns that hospitals were either refusing to treat certain emergency room patients, or transferring them to other institutions, based on budgetary limitations (a practice known as "patient dumping").   See Torretti, 580 F.3d at 173. Pursuant to the statute, hospitals are required to provide the following medical care to any individual who presents for emergency treatment: "(a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstablilized individuals to outside hospital facilities."   Id. (citing 42 U.S.C. § 1395dd(a)-(c)).   Under the screening provision of the EMTALA, where a hospital has an emergency department, and an individual comes to the emergency department seeking examination or treatment for a medical condition, the hospital must provide for an "appropriate medical screening examination."   Smith v. Albert Einstein Med. Ctr., CIV A 08-05689, 2009 WL 2487417, at *5 (E.D. Pa. Aug. 12, 2009) aff'd, 378 F. App'x 154 (3d Cir. 2010).   Although the EMTALA does not define what an "appropriate medical screening" is, circuit courts have "interpreted the statute as requiring hospitals to provide uniform screening to all those who present substantially similar complaints."   Kauffman v. Franz, CIVA 07-CV-5043, 2009 WL

6

3157333, at *2 (E.D. Pa. Sept. 25, 2009) (quoting Cruz-Quiepo v. Hosp. Espanol Auxilio Mutuo de Puerto Rico, 417 F.3d 67, 70 (1st Cir. 2005)); see also Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998); Summers v. Baptist Medical Center Arkadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996); Repp v. Anadarko Municipal Hospital, 43 F.3d 519, 522 (10th Cir. 1994); Holcomb v. Monahan, 30 F.3d 116, 117 (11th Cir. 1994).   Hospitals are given great discretion under this provision, and may develop their own screening procedures. Kauffman, 2009 WL 3157333 at *2.   It is the responsibility of an individual hospital to determine what its screening procedures will be; "[h]aving done so, it must apply them alike to all patients."   Byrne, 2012 WL 4108886 at *3; Kauffman, 2009 WL 3157333 at *2; see also Phillips v. Hillcrest Med. Ctr., 244 F.3d 790, 797 (10th Cir. 2001) (observing that because deference is given to a hospital in determining the screening it is capable of, hospitals will be held to the standard they create); Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994) (The statute's screening provisions requires "that a hospital apply its standard of screening *uniformly* to all emergency room patients, regardless of whether they are insured or can pay.") (emphasis in original) (internal quotation omitted); Gatewood v. Wash. Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures."); Johnson v. Portz, Civ. A. No. 08-593-JJF, 2010 WL 1644279, at *3 (D. Del. Apr. 22, 2010) (holding that issue of fact remained as to whether hospital followed its own standard screening procedure); Feigery v. York Hosp., 59 F. Supp. 2d 96, 104 (D. Me. 1999) ("[A] plaintiff can show a disparate screening under the EMTALA by showing that a hospital refused to follow its own screening procedures in a particular instance.").   "Crucial to any screening

7

claim, the plaintiffs must allege that the hospital [failed to] apply its standard of screening uniformly to all emergency room patients." <u>Smith</u>, 2009 WL 2487417 at *5; <u>see also</u> <u>Moore v. John F. Kennedy Memorial Hosp.</u>, No. Civ. A. 93-3428, 1994 WL 2531, at *2 n.4 (E.D. Pa. Jan. 5, 1994).

Defendants' motion must be denied because one of the foundational factual determinations in assessing an EMTALA screening claim remains unresolved: what the hospital's standard screening procedures *are*.   Instead of submitting its standard screening procedures in order for this Court to adequately consider Plaintiff's claim, Defendants have apparently chosen to rely on excerpts of Faust and Rathi's depositions, medical records, and expert reports as support for their position that the screening claim is not meritorious.   It is well settled, however, that a court should consider the *hospital's* screening procedures when considering a screening claim under the EMTALA.   <u>See, e.g.,</u> <u>Summers</u>, 91 F.3d at 1140 (discussing consideration of hospital's screening procedure as it relates to EMTALA claim); <u>Byrne</u>, 2012 WL 4108886 at *3 ("Here, the Hospital has submitted evidence that it had two policies that governed screening emergency room patients who complained of chest pain.   The Hospital applied both policies to Mr. Byrne by giving him a physical exam, taking his medical history, and giving him an EKG, a cardiac work-up, and chest x-rays."); <u>Johnson</u>, 2010 WL 1644279 at *4 (holding that there were remaining issues of fact regarding the use of hospital's chest pain protocol).   Defendants' failure to proffer the hospital's standard screening procedures, while simultaneously arguing that Plaintiff has not established that Defendants' actions did not conform to these standards, therefore "puts the cart before the horse."

The record presently before this Court simply does not allow it to resolve Plaintiff's

8

claim because of this deficiency.   Defendants' argument relies on the averment that "it is evident from Rathi's testimony that she followed *her usual practice*, and screened Ms. Blake *as she does all chest pain patients that come to the Emergency Department*."   Def. Mot. for Summ. J. 7 (emphasis added).   Defendants further argue that "whether or not plaintiff's experts agree with Dr. Rathi's medical judgment, it is clear that Dr. Rathi was following a logical process, in a thoughtful manner to rule in and rule our [sic] various medical conditions for this patient.   This constitutes screening within the scope of EMTALA."   Id. at 10.   Rathi's own medical judgment, however, does not shed light on the *hospital's* standard screening procedures. In fact, at numerous points within her deposition, Rathi seems to be unaware of whether any standard hospital screening procedures even exist.   See Rathi Dep. at 31:17-22 ("**Q.** Were you ever given any written protocols by Lankenau, by your employer, while you worked at Lankenau on how to handle chest pain? Does such a thing exist that you're aware of?" **A.** Not that I'm aware of."); Id. at 114:6-115:9 ("**Q.** So the things that we talked about before, these advertisements from Main Line Health from Lankenau Hospital about rapid response time for chest pain, there's no mechanism that you could have employed at that time to help you out in this busy emergency room to have this person with chest pain evaluated; is that correct? . . . **A.** Let me just read it, because maybe it says here there's a mechanism or something, but – I mean, unless it's – it's designated somewhere, I'm not aware of there being any.").   Although throughout her deposition Rathi discusses "standard" practice across the hospitals where she has worked, only a *particular* hospital's screening procedures are relevant to an EMTALA screening claim; the statute is not premised on a general appropriate "standard of care."   See Byrne, 2012 WL 4108886 at *3 n.4 (citing Battle v. Memorial Hosp., 228 F.3d 544, 557 (5th Cir. Miss.

9

2000)).

Faust's deposition also fails to clarify what the hospitals standard screening procedures are.    Akin to Rathi, Faust, throughout her deposition, seems to have an unclear understanding of Defendants' screening procedures.    See Faust Dep. at 15:24-16:9 ("**Q.** Okay.    Are you familiar – did there exist – did there exist in the time that you were at Lankenau, a policy where people who came into the hospital at Lankenau with complaints of chest pain were evaluated more rapidly than people who were in the hospital, in the emergency room, for less significant symptoms?    **A.** I don't know if there is a protocol specifying any time frame."); Id. at 23:4-13 ("**Q.** Okay.    So there was no – there was nothing in place back at the time you were at Lankenau that would dictate somebody that came in with chest pain or somebody who came in and was critical [sic] ill would go in – into a certain area in the emergency room; nothing like that existed?    **A.** No.    **Q.** Okay.    **A.** Or at least I don't think so."); Id. 84:15-85:5 ("**Q.** Let me ask you this.    So you've seen – we've talked a little bit about this chest pain protocol and the tests that you typically order when a person comes in with chest pain.    You'd agree with me that based upon your experience, Lipase is not on that chest pain protocol? . . . **THE WITNESS**: I don't – I don't know if Lipase is or is not on the protocol without seeing it.").    Interestingly, it does appear from the deposition that there *are* written hospital screening procedures that would govern the instant matter.    During Faust's deposition, the following exchange occurred:

**Q.** Okay.    It is my understanding that there was a protocol in place at the hospital that when somebody came in with chest pain, certain things were ordered as a matter of course.    Are you familiar with that?

**A.** Yes.

**Q.** All right.   And – what was that protocol called?

**A.** It had a name. May I look through this packet and see if I can –

**Q.** Sure.

**A.** – try to find it?   I'm just saying, some places call it one thing; it always has to be specific to the hospital.

…

**THE WITNESS**: well, I don't remember what it was called, but –

**Q.** That's fine.   But regardless of what it was called, can you explain what it was?

**A.** It was things that a nurse could order to expedite care.

**Q.** And what would those things be that a nurse could order to expedite care with a patient with chest pain at Lankenau?

**A.** Do you have a – a copy of the – the paper that I could look at?

**Q.** Not with me, but – and that's okay.   If you don't – I mean, we don't need you just reading off of the protocol here.   If you don't remember, just tell us you don't remember.   That's fine.

**MS. CAIRNS:** Yes, just from your memory, Cynthia.

**THE WITNESS:** What's that? Just from my memory?

11

**MS. CAIRNS:** Just from your memory.

Faust thereafter proceeds to outline what she *believes* was Lankenau's policy regarding expediting care for patients presenting with chest pain; however, not only is she merely relying on her memory for these statements, but it also appears, based on the record, that a written hospital screening protocol is, in fact, in existence.   Although courts have disagreed on whether *written* procedures are necessary to evaluate an EMTALA screening claim, the fact remains that it is unclear to this Court what the hospital's standard screening procedures actually *are*, whether written, informal, or otherwise; thus, a factual issue remains.   See del Carmen Guadalupe v. Negron Agosto, 299 F.3d 15, 22 (1st Cir. 2002) ("Although they are effective for demonstrating disparate treatment, written hospital screening policies may not exist, and therefore cannot be necessary to a disparate treatment determination.").   But see Hoffman v. Tonnemacher, 425 F. Supp. 2d 1120, 1138 (E.D. Ca. 2006) ("It is also true that Dr. Tonnemacher declared that he believes that the 'policies and procedures in place at the [emergency department] of MMC were more than sufficient to comply with EMTALA."   However, Dr. Tonnemacher also testified that he has not seen any written policies, protocols or procedures from MMC regarding EMTALA, and has not seen any information circulated by MMC regarding EMTALA.").   Therefore, the record before this Court does not resolve the threshold matter of what policies the hospital has created to screen patients presenting to the emergency department with chest pain.[1]

Because all determinations regarding Plaintiff's EMTALA screening claim flow from the factual issue of what the hospital's standard screening procedures *are*, including whether these

---

[1] The remainder of exhibits attached to Defendants' motion, i.e. medical records and expert reports, also do not bring any clarity regarding the hospital's standard screening procedures.

procedures were followed in the instant case, there remains a genuine issue of material fact.   As such, Defendants' motion for summary judgment will be denied.

## IV.   <u>CONCLUSION</u>

Based on the foregoing analysis, this Court will deny Defendants' motion for summary judgment.   An appropriate Order follows.